**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT DECKER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLIANT TECHNOLOGIES, LLC,** | : | **NO. 08-5133** |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

GENE E.K. PRATTER , J.                                                             MAY 16, 2012

Plaintiff Robert Decker brings a two-count complaint against his former employer,

Alliant Technologies LLC, claiming discriminatory discharge and failure to accommodate in

violation of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human

Relations Act ("PHRA").  Alliant moved for summary judgment as to all claims.  Def.'s Mot.

(Doc. No. 26).  For the following reasons, the Court denies the Motion.

**I.  Factual Background**[1]

Alliant is an information technology consulting company.  *See* Def.'s Statement of

Undisputed Material Facts ¶ 3 (Doc. No. 26-2) (hereinafter, "Def.'s SUMF"); Pl.'s Statement of

Undisputed Material Facts ¶ 3 (Doc. No. 38) (hereinafter, "Pl.'s SUMF").  The company hired

Mr. Decker in July 2004 as an Account Manager in its Sales Department.  *See* Def.'s SUMF ¶ 1;

Pl.'s SUMF ¶ 1; Compl. ¶ 5; Ans. ¶ 5.  In that position, Mr. Decker was responsible for

"prospecting and selling to accounts within his assigned territories, as well as 'grandfathered'

accounts from other territories," and "was expected to produce a certain level of gross profits per

month."  Pl.'s SUMF ¶¶ 2, 15; *see* Def.'s SUMF ¶¶ 2, 15.  When he was hired, Mr. Decker

---

[1] The relevant facts of this case are, as they must be, viewed in the light most favorable to
Mr. Decker, as the non-moving party.

signed a form acknowledging that he was employed on an at-will basis and that he could be terminated at any time for any reason.  *See*; Pl.'s SUMF ¶¶ 4-5; Def.'s SUMF ¶¶ 4-5.[2]

Mr. Decker was diagnosed with attention deficit hyperactivity disorder ("ADHD") in late 2004, and bipolar disorder type II in 2005.  *See* Pl.'s SUMF ¶ 7; Def.'s SUMF ¶ 7.[3]  Mr. Decker believes that his ADHD and bipolar disorder adversely impacted his job performance from mid-2004 until late 2005.  *See* Pl.'s SUMF ¶ 8; Def.'s SUMF ¶ 8.

Mr. Decker tried different medications to manage his conditions, apparently without success.  However, in late 2005, a physician, Dr. Becker,[4] adjusted Mr. Decker's medications. *See* Pl.'s SUMF ¶ 9; Def.'s SUMF ¶ 9; Decker Dep. at 12:13-16 (Doc. No. 33-1).  At that time, Dr. Becker informed Mr. Decker that that it would take three to four weeks for the medications to work properly.  According to Mr. Decker, after Dr. Becker regulated the medications, the mental and emotional symptoms associated with his conditions ceased.  *See* Def.'s SUMF ¶ 9; Decker Dep. at 12:13-12:21, 14:1-14:9, 152:1-152:7.  Mr. Decker believed his conditions stopped affecting his job performance by the end of 2005.  *See* Decker Dep. at 37:21-38:11, 40:18-41:2.

In September 2005, Mr. Decker communicated for the first time with his employer about his medical conditions. *See* Def.'s SUMF ¶¶ 10, 14; Pl.'s SUMF ¶ 10; Decker Dep. at 14:20-14:23, 13:7-13:11.  At that time, he informed his supervisor, Scott McKinney, that he suffered from ADHD.  *See* Def.'s SUMF ¶¶ 10, 14; Pl.'s SUMF ¶ 10; Decker Dep. at 13:7-13:11, 39:20-

---

[2]  Ostensibly, Alliant never altered the terms of Mr. Decker's employment.  Mr. Decker admits that "he never received anything signed by the President of Alliant that gave him any other protection other than employment at-will."  Def.'s SUMF ¶ 6; *see* Pl.'s SUMF ¶ 6.

[3]  Mr. Decker apparently experiences deafness in his right ear.  *See* Pl.'s SUMF ¶ 7. However, Mr. Decker's Complaint does not reference this condition, and as such, Mr. Decker has never expressly advanced the condition as a basis for his claims.

[4]  Dr. Becker's full name does not appear in the record.

40:3, 12:11-12:14, 14:12-14:23.  Mr. Decker told Mr. McKinney that he had "been trying different medications throughout the year" to address his condition in order to "be more productive . . . at work" and that his doctor "seems to have nailed [the ADHD condition] down, [the doctor's treatment is] working so I shouldn't have any more issues going forward, I should be able to do my job more effectively."  *See* Decker Dep. at 12:17-13:1.  Mr. McKinney reacted skeptically, claiming that he did not believe that Mr. Decker suffered from any medical condition, and that if Mr. Decker did have a condition, that it was not affecting his performance. *See id.* at 14:24-15:12; Def.'s SUMF ¶ 14.  According to Mr. Decker, he responded that he could not understand why Mr. McKinney did not believe him and offered to provide medical records to show that he was diagnosed with ADHD.  Decker Dep. at 15:5-15:6, 16:2-16:11.  Again, as recounted by Mr. Decker, Mr. McKinney "basically blew [Mr. Decker] off and told [him] whatever and that was about it."  Decker Dep. at 16:10-16:11.

For over a year, from January 2005 to February 2006, Mr. Decker did not meet his monthly gross profit goals.  *See* Pl.'s SUMF ¶¶ 15-16; Def.'s SUMF ¶¶ 15-16.  In January 2006, Mr. Decker met for a performance review with Josh Montone, who had replaced Mr. McKinney as Mr. Decker's supervisor.  *See* Decker Dep. at 38:13-39:13, 43:19-43:21; Montone Dep. at 7:7-9, 9:20-10:7 (Doc. No. 33).  At the meeting, Mr. Decker expressed that he was disappointed with his prior performance, but that his future performance would improve because he was on a medication for adult attention deficit disorder and no longer affected by the symptoms.  *See* Decker Dep. at 38:15-39:13; Montone Dep. at 9:20-10:1, 11:5-11:9.  Mr. Decker has testified that, after speaking with both Messrs. McKinney and Montone in late 2005, he did not feel that he needed accommodation in order to perform his job duties successfully.  *See* Pl.'s SUMF ¶ 13; Def.'s SUMF ¶ 13.

On February 6, 2006, Alliant placed Mr. Decker on a performance plan ("PIP").  *See* Def.'s SUMF ¶ 17; Pl.'s SUMF ¶ 17.  The PIP was instituted for Mr. Decker because his sales were "sub-par" and the PIP allowed Mr. Decker's work performance to be tracked.  Montone Dep. at 15:1-15:9; *see also* Brennan Dep. at 13:2-13:13 (Doc. No. 33-2).  Under the PIP, Mr. Decker was required to submit four sales proposals and book five appointments per week from February 6, 2006 until April 1, 2006.  Def.'s Mot., Ex. E (Doc. No. 40).  Additionally, Mr. Decker needed to establish "a pipeline to substantiate gross profit dollar totals which [would] lead to an average of $30,000/month for the next quarter."  *Id.*

Mr. Decker acknowledged that his prior work performance warranted enactment of the PIP and that the plan was reasonable.  *See* Pl.'s SUMF ¶¶ 18, 19; Def.'s SUMF ¶¶ 18, 19.  Mr. Decker recognized that if he failed to meet the goals set forth in the PIP, he could be terminated.  *See* Def.'s SUMF ¶ 20; Pl.'s SUMF ¶ 20.

Upon the start of the PIP, Mr. Decker met with Mr. Montone weekly and provided written e-mail updates about his sales proposals and appointments.  *See* Decker Dep. at 53:1-53:14, 53:18-53:20; Montone Dep. at 16:6-16:9.  According to Mr. Decker, Mr. Montone indicated that his performance was improving.  *See* Decker Dep. at 53:21-53:25.  However, Alliant managers testified that, during the course of the PIP, Alliant management assessed Mr. Decker's performance and determined that Mr. Decker was not going to be able to meet the PIP.  *See* Brennan Dep. at 21:11-21:15, 23:25-24:6, 25:15-26:4; Flitcroft Dep. at 8:18-8:20; 20:4-20:13 (Doc. No. 33-1); Montone Dep. at 17:25-18:14.

On March 14, 2006,[5] Jay Brennan, Alliant's Vice President of Human Resources, informed Mr. Decker that his employment was being terminated.  *See* Pl.'s SUMF ¶ 21; Def.'s SUMF ¶ 21. Mr. Brennan also spoke with Mr. Decker over the telephone about this issue twice that day.  During the earlier of these conversations, Mr. Brennan learned for the first time of Mr. Decker's ADHD when Mr. Decker informed him about his condition.  *See* Brennan Dep. at 10:22-11:7, 14:17-15:1, 15:13-16; *see also* Decker Dep. at 61:25-62:3, 57:6-57:18.  According to Mr. Brennan, Mr. Decker stated that he had previously told Mr. Kinney about it as well.  *See* Brennan Dep. at 15:13-15:16.  Mr. Decker also raised that the PIP was to run until April 1, 2006. *See* Pl.'s SUMF ¶ 22; Def.'s SUMF ¶ 22.  During the call, Mr. Brennan indicated that he and Mr. Montone would address that timing issue.  *See* Def.'s SUMF ¶ 22; Pl.'s SUMF ¶ 22.

Thereafter, Mr. Brennan called Mr. Decker, with Mr. Montone on the telephone line.  *See* Pl.'s SUMF ¶ 23; Def.'s SUMF ¶ 23.  According to Mr. Decker, Mr. Brennan notified Mr. Decker that he was not going to meet the goals set forth in PIP by the deadline; therefore, Mr. Decker's accounts were to be transferred to other employees and he was to be terminated.  *See* Decker Dep. at 67:4-67:10; 144:19-144:24.  Mr. Decker disputed the assessment of his performance that Mr. Brennan had presented, claiming that he was fulfilling the PIP's requirements for appointments and sales proposals, and that he had prospective deals in the pipeline.  *See* Decker Dep. 67:14-67:22.  He contended that he should be permitted to have the remainder of the time until the PIP ended.  *See id.* 67:19-67:22.

Mr. Decker testified that the conversation concluded with him asking whether he was going to be terminated regardless of his work performance at the end of the PIP, and Mr.

---

[5]  In the transcripts of several depositions, this date is sometimes referred to as March 20, 2006.  However, because both parties' statements of facts agree upon March 14, 2006, the Court uses that date.

Brennan stating that he would have to consult with Bruce Flitcroft, President and CEO of Alliant Technologies, before any other actions were taken.  *See* Decker Dep. 92:10-92:22.

Mr. Brennan testified that after these conversations with Mr. Decker, Mr. Brennan spoke with Messrs. McKinney and Montone to ask them about Mr. Decker's comments about his medical condition and what Mr. Decker had said to them.  *See* Brennan Dep. at 15:13-17:6.  Both said that Mr. Decker had represented that he was taking medication for ADHD and that his condition did not affect his work performance.  *Id.*

After Mr. Brennan and Mr. Montone spoke with Mr. Decker, they had a conversation with Mr. Flitcroft, and persuaded him to agree to allow Mr. Decker to continue his PIP though the end of March and for Alliant to recant the termination.  *See* Flitcroft Dep. at 8:18-9:4, 12:14-12:18; *see also* Montone Dep. at 17:6-17:15.  Mr. Flitcroft testified that, after he decided to extend Mr. Decker's employment throughout the duration of the PIP, in his view it was possible for Mr. Decker to redeem his performance in the remaining days of the PIP to save his job.  *See* Flitcroft Dep. at 13:7-13:17.

Following these events, the record contains diverging testimony as to whether Alliant notified Mr. Decker that it had recanted the termination at that time and was allowing him to complete the PIP.  Mr. Brennan testified that on March 20, 2006, he called Mr. Decker in the afternoon and informed him that he was still employed and would be through the end of the PIP, at which time Alliant would offer him the option to become an independent contractor or to extend the PIP.   *See* Brennan Dep. at 20:7-20:14.

In contrast, Mr. Decker testified that after speaking with Mr. Brennan and Mr. Montone, a week passed without Mr. Decker hearing anything more on the subject of his employment status.  Decker Dep. at 97:8-97:16.  During that time, Mr. Decker "figured some kind of

miscommunication on the other side so I just kept plugging away" and working as if he had not had the conversation with Mr. Brennan.  Decker Dep. at 101:15-102:18.

Thereafter, during the last week of the PIP, from March 27 to March 31, 2006, Mr. Decker had some communications and meetings with Mr. Flitcroft.  *See* Decker Dep. at 62:19-62:23; *see also* Flitcroft Dep. at 9:16-9:18. One of the conversations occurred on the morning of March 27, 2006, after Mr. Decker sent an email the day before asking whether management had come to a decision on his termination, and requesting a termination letter in the event that he was being terminated.  *See* Decker Dep. at 92:22-93:9; 94:12-94:17.[6]  According to Mr. Decker, during the conversation, Mr. Flitcroft "wanted to know where my head was at" to which Mr. Decker responded "I'm trying to figure out if I'm still here [employed with Alliant] or not."  *Id.* at 94:20-94:22.  Mr. Decker also testified that Mr. Flitcroft informed him that he could continue to work under the PIP and would not be terminated if he met certain metrics of his PIP.  *See* Decker Dep. at 96:17-96:21; 99:18-100-11.

During this same or another conversation between Messrs. Flitcroft and Decker, Mr. Flitcroft told Mr. Decker to "get his head screwed on straight" and to "clear his head."  *See* Flitcroft Dep. at 10:3-10:6; Decker Dep. at 95:2-95:3, 96:4-96:5.  Both Messrs. Flitcroft and Decker understood the general conversation in which these phrases were used to mean that Mr. Flitcroft thought Mr. Decker was misunderstanding and confusing the issues involving Mr. Decker's employment status at Alliant. *See* Flitcroft Dep. at 10:7-10:16; Decker Dep. at 95:3-96:5.

However, according to Mr. Decker, Mr. Flitcroft also expressed awareness of Mr. Decker's medical condition during this conversation:

---

[6]  Mr. Flitcroft's testified that the meeting began after Mr. Decker came to Mr. Flitcroft's office "unannounced."  Flitcroft Dep. at 9:16-9:23.

> Q:      What was [Mr. Flitcroft] trying to communicate to you that [your employment status] was?  What was the miscommunication he was trying to communicate to you?
>
> A:      He told me that I had until April 1st, that I always knew that I had until the 1st and that I quit on them, because I hadn't worked the past week because I was mixing things up with what was going on and that *I need to get my head screwed on straight and he goes I know you have this – I can't think of the word he used, something around your disease, ailment he said, around your ailment, but you need to understand* that you have until the 1st and he asked me do you want this job or not and I said I don't know and he goes, well, you need to clear you head and call me in an hour and let me know.
>
> . . .
>
> Q.      So Mr. Flitcroft told you that you had until April 1st to work on your performance plan which was not what you understood, you understood you had been terminated on the 20th, correct?
>
> A.      Right.
>
> Q.      So Mr. Flitcroft expressed to you, he asked you do you want this job or not and you said you don't know?
>
> A.      Right.

*See* Decker Dep. at 95:16-96:25 (emphasis added).  Mr. Decker interpreted this conversation as reflecting Mr. Flitcroft's view that Mr. Decker was misunderstanding matters due to his ADHD. *See* Decker Dep. at 125:5-125:18.  During a conversation on March 28, 2006, according to Mr. Decker, Mr. Flitcroft expressed the opinion that Mr. Decker was confused about his employment status because of ADHD.  *See* Decker Dep. at 127:16-128:4.

Mr. Flitcroft has testified that he did not make a statement to Mr. Decker that in Mr. Flitcroft's view ADHD was affecting Mr. Decker's memory (or ability to comprehend).  *See* Flitcroft Dep. at 9:24-10:2.  Mr. Flitcroft claims his comment, "get your head screwed on straight," was colloquial and intended to remark on Mr. Decker's apparent disregard of the issues involving his performance under the PIP and proposed employment alternatives.  Flitcroft Dep.

at 10:7-10:16.  He claims he frequently uses the term, and made the comment in response to Mr.

Decker being "agitated and angry and unprofessional . . . .  My using that term was to try to focus

the conversation and a resolution." *Id.*

 Mr. Decker testified that he had never discussed his medical condition with Mr. Flitcroft

prior to these conversations.  *See* Decker Dep. at 59:19-59:23.  According to Mr. Flitcroft, he

learned of Mr. Decker's ADHD during the last week of March when Mr. Decker's termination

was being discussed among management when Mr. Brennan mentioned it.  *See* Flitcroft Dep. at

6:8-6:16.  Mr. Flitcroft does not recall if Mr. Brennan said that Mr. Decker was taking any

medication.  *Id.* at 6:17-6:19.[7]   In contrast, Mr. Brennan testified that he first spoke with Mr.

Flitcroft about Mr. Decker's medical condition at a point later in time than the time frame that

Mr. Flitcroft recalls.  According to Mr. Brennan, he first spoke to Mr. Flitcroft *after* Mr. Decker

had filed an EEOC complaint when Mr. Flitcroft expressed to Mr. Brennan that he was unaware

of Mr. Decker's medical condition until Mr. Decker informed him of it during their meetings

around March 20 to March 31, 2006.  *See* Brennan Dep. at 17:10-18:4.

 Also during the time period of March 27 to March 31, 2006, including during Mr.

Decker's conversations with Mr. Flitcroft, there was discussion between Mr. Decker and several

Alliant managers concerning alternatives to terminating Mr. Decker.  At one point, Mr. Decker

asked for 30 days leave.  *See* Def.'s SUMF ¶ 29; Pl.'s SUMF ¶ 29; Decker Dep. at 98:10-99:7;

106:14-107:18.[8]  This idea initiated with Mr. Decker who testified that his medical providers did

---

[7]  Mr. Flitcroft's testimony also is susceptible to being understood as suggesting that during a March 30, 2006 conversation Mr. Decker made reference to his ADHD to Mr. Flitcroft, after which Mr. Flitcroft sought explanation from Mr. Brennan and learned of Mr. Decker's ADHD.  *See* Flitcroft Dep. at 25:1-25:9.

[8]  The record contains evidence that Mr. Decker requested 30-day leave both in an e-mail to Mr. Flitcroft, *see* Decker Dep. at 98:10-98:13, and communicated to Mr. Brennan, *see* Brennan Dep. at 22:14-23:8.

not inform him that such leave was required due to his medical condition, but he sought leave for the purpose of working out the issues relating to his employment status.  *See* Def.'s SUMF ¶¶ 29, 30; Pl.'s SUMF ¶¶ 29, 30; Decker Dep. at 98:10-99:7.  Mr. Brennan testified that he was the one who orally denied Mr. Decker's request for leave because there were no grounds for such leave under the ADA or FMLA.  *See* Brennan Dep. at 22:23-23:8.[9]

There is also conflicting evidence about which Alliant manager or managers made the ultimate decision to terminate Mr. Decker's employment.  Mr. Brennan testified both that "[i]t was Mr. Flitcroft's decision" to discharge Mr. Decker and that "[i]t was a mutual decision between me, Josh [Montone] and Bruce [Flitcroft]" to end his employment with Alliant. Brennan Dep. at 29:11-29:13; 29:23-30:1.  Mr. Montone testified that he was informed that Mr. Decker would no longer be an Alliant employee by Messrs. Flitcroft and Brennan, and that he disagreed with the timing of the termination because Mr. Decker's PIP was still ongoing.  *See* Montone Dep. at 21:1-21:5; 21:10-21:14.  Mr. Flitcroft testified that he and Mr. Montone had conflicting views on ending Mr. Decker's employment before the PIP's end-date, but that the

---

[9]  Other possible alternatives to ending Mr. Decker's employment were discussed in this time period.  On March 30, 2006, Mr. Decker proposed wiping the slate clean, as it were, and letting him start again as if he was a new employee with no performance plan.  *See* Flitcroft Dep. at 15:22-16:1; *see also* Decker Dep. at 108:19-108:21.  Mr. Flitcroft rejected this proposal, but instead offered to make Mr. Decker an independent contractor under the sales agent plan.  *See* Flitcroft Dep. at 16:2-16:3; 16:13-16:23; *see also* Decker Dep. at 104:12-104:18.  At some point, Mr. Decker declined this proposal.  *See* Decker Dep. at 107:19-21.

The proposal of extending the PIP for an additional period of time may have been discussed among Messrs. Flitcroft, Brennan, and Decker.  According to Mr. Flitcroft, Mr. Decker proposed a 60-day extension of the PIP.  *See* Flitcroft Dep. at 15:22-16:1.  Mr. Decker testified that Alliant raised the possibility of extending the PIP a week.  *See* Decker Dep. at 108:6-108:14.  Mr. Brennan testified that he recommended to Mr. Flitcroft extending the plan to June or July 1st, and raised the idea with Mr. Decker.  *See* Brennan Dep. at 27:7-27:19; 20:7-20:14.

Regardless, this idea did not appear to go far in discussions.  *See, e.g.*, Decker Dep. at 102:20-102:22 (referring to a proposed PIP extension or an independent contractor position as a "spit in the face almost").

decision to end Mr. Decker's employment with Alliant was "shared and was more of a consensus." Flitcroft Dep. at 19:19-21:21. According to Mr. Flitcroft, he expressed on two occasions that he thought Mr. Decker's employment should end. *Id.* at 19:15-19:17.

Alliant ended Mr. Decker's employment on March 31, 2006. *See* Pl.'s SUMF ¶ 31; Def.'s SUMF ¶ 31.

## II.  Legal Standard

The Court may grant summary judgment pursuant to Rule 56 if the "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), (a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257.

11

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

## III.  Discussion

Mr. Decker invokes both the ADA and PHRA, but because the PHRA is interpreted "in accord with its federal counterparts," *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), the Court limits its discussion to Mr. Decker's ADA claims.[10]

### A.  Disparate Treatment Claim

The ADA prohibits an employer from terminating or discriminating against any individual employee on the basis of the employee's disability.  "When a plaintiff attempts to prove a discrimination claim under a pretext theory, the *McDonnell Douglas* burden-shifting framework applies." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (recognizing that "the burden-shifting framework of *McDonnell Douglas* . . . applies to ADA disparate treatment . . . claims").  Under that framework, a plaintiff must first set forth a *prima facie* case of discrimination under the ADA, which requires showing that (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation by her employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *See Shaner*, 204 F.3d at 500; *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

---

[10]  Nonetheless, the Court's disposition of Mr. Decker's ADA claims applies equally to his PHRA claims.  *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002).

The burden to establish a *prima facie* case is a not an onerous one, but a *prima facie* case can allow a court "to eliminate the most obvious, lawful reasons for the defendant's action." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

   If the plaintiff establishes a *prima facie* case of discrimination, then an inference of discriminatory motive arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998).  If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason is merely pretext for intentional discrimination.  *Makky*, 541 F.3d at 214.  The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *See Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 759 n.3 (3d Cir. 2004) (quoting *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

   Alliant argues that the record demonstrates that Mr. Decker fails to satisfy the first and third prongs of a *prima facie* case of disability discrimination.  According to Alliant, Mr. Decker cannot show from the record that he was disabled within the meaning of the ADA at the time of his termination, and that he suffered an adverse employment decision as a result of discrimination.  Alliant also contends that, even if Mr. Decker can satisfy the *prima facie* case, he cannot satisfy his burden of establishing pretext.  The Court addresses these three areas of contention in turn.

1.  *Prima Facie* Element:  Disability Within the Meaning of the ADA

   Under the first prong of the *prima facie* case, to qualify as "disabled" under the ADA, a person (a) has "a physical or mental impairment that substantially limits one or more of the major life activities"; (b) has "a record of such an impairment"; or (c) is "regarded as having such an

impairment." *Kelly*, 94 F.3d at 105 (quoting 42 U.S.C. § 12102(2)).  "Major life activities"

includes "functions such as caring for oneself, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning, and working."  *See Eshelman v. Agere Systems, Inc.*, 554

F.3d 426, 434 (3d Cir. 2009) (quoting 29 C.F.R. § 1630.2(i)).  Thinking is a major life activity.

*Id.*  Mere medical diagnosis of an impairment alone is insufficient to establish disability status

under the ADA.  *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 513 n.5 (3d Cir. 2001);

*Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002), *superseded on other grounds by* Pub.

L. No. 110-325 (2008).[11]

Mr. Decker is proceeding on the basis that he has a "regarded as" disability.[12]  To meet

the "regarded as" test, plaintiffs "must show that [an employer] thought they were disabled

'within the meaning of the [ADA] statute.'"  *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir.

2007) (quoting *Rinehimer*, 292 F.3d at 381).  A plaintiff may be "regarded as" disabled if: (1) she

has a physical or mental impairment that does not substantially limit major life activities but is

---

[11]  The ADA Amendments Act of 2008 (ADAAA) became effective January 1, 2009. *See* Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (to be codified at 29 U.S.C. § 705 note).  "The ADAAA amends the ADA in important respects, particularly with regard to the definition and construction of "disability" under the statute."  *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 188 n.17 (3d Cir. 2009).  However, the events at issue precede the effective date of the ADAAA, and the parties here have not argued that these amendments have retroactive effect. *See* Tr. 6:1-6:4; 12:7-12:9 (Doc. No. 45).  Accordingly, the Court does not apply to the ADAAA and adheres to the applicable law as it existed during the events in question.

[12]  Mr. Decker's briefing argues that he has satisfies all three statutory definitions of "disability."  However, at oral argument, Mr. Decker's counsel confirmed that Mr. Decker could not satisfy the first two alternative definitions based upon the evidentiary record. *See* Tr. 23:8-23:12; *see also id.* 15:7-15:13.  That is, Mr. Decker agrees that his condition was fully mitigated by medication at the time of his termination, and as such he did not have an actual disability, *i.e.*, he cannot meet the ADA's "physical or mental impairment" definition for disability.  *See* Tr. 12:4-12:24; 15:1-15:5.

Additionally, Mr. Decker admits that there insufficient evidence in the record to demonstrate a "record of" a disability.  *Id.* at 22:25-23:14.  As such, the Court determines that Mr. Decker is advancing his claims based upon a "regarded as" disability.

treated by the covered entity as constituting such impairment; (2) she has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) she has no such impairment but is treated by a covered entity as having a substantially limiting impairment.  *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir. 1999) (citing 29 C.F.R. § 1630.2( 1 )); *see also Tice*, 247 F.3d at 514.  EEOC regulations define "substantially limited" as an inability "to perform a major life activity that the average person in the general population can perform," or a significant restriction "as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  *Emory v. AstraZeneca Pharms., LP*, 401 F.3d 174, 180 (3d Cir. 2005) (quoting 29 C.F.R. § 1630.2(j)(1)).

The inquiry of the "regarded as" analysis is directed upon "the reactions and perceptions of the persons interacting or working with him. . . . [And t]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled . . . ." *Kelly*, 94 F.3d at 109.  "[A]n inquiry into how an employee was 'regarded' is necessarily quite fact-specific, and all of the surrounding circumstances may be relevant in reaching a conclusion." *Tice*, 247 F.3d at 515.  "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, app. § 1630.2( *l* ).  However, "to be covered under the 'regarded as' prong of the ADA the employer must 'regard[] the employee to be suffering from an impairment within the meaning of

the statutes, not just that the employer believed the employee to be somehow disabled.'"
*Rinehimer*, 292 F.3d at 381 (quoting *Rinehimer*, No. 98-562, slip op. at 2).  Consequently,
liability only attaches to a "mistake that leads the employer to think that the employee is
substantially limited in a major life activity."  *Taylor*, 177 F.3d at 192.

Mr. Decker argues that the evidence as to events occurring immediately prior to his
termination provide grounds for a jury to conclude that Alliant regarded him as disabled within
the meaning of the ADA.  Specifically, Mr. Decker argues that Mr. Flitcroft's statements of
needing "to get [his] head screwed on straight" referred to Mr. Decker's ADHD.  Pl.'s Resp. at
17 (Doc. No. 32).[13]

Although both parties agree that this phrasing was used to articulate Mr. Flitcroft's
impression that Mr. Decker misunderstood and was confused about his employment status, they
dispute whether, in making those comments, Mr. Flitcroft perceived Mr. Decker's ADHD to be
the cause of Mr. Decker's confusion.  On one hand, when considering the conversation based
upon Mr. Flitcroft's account, Mr. Flitcroft's comments can be regarded as innocuous, a
colloquial phrase that he commonly uses; and thereby not indicative of whether Mr. Flitcroft
perceived Mr. Decker to have an impairment that substantially limits his major life activities.

However, on the other hand, Mr. Decker contends that Mr. Flitcroft pointedly referred to
his ADHD as an "ailment" and did so in conjunction with several colloquial phrases using
"head" references.  Indeed, Mr. Decker testified that Mr. Flitcroft associated the "ailment" with

---

[13]  Although the Complaint states that Mr. Decker has both ADHD and bipoloar disorder
(and the mental and emotional symptoms associated with these conditions were regulated by
medication and had ceased), there is no evidence in the record that anyone at Alliant ever knew
Mr. Decker had bipolar disease.  Given that the only impairment that Mr. Decker and the Alliant
managers ever discussed or referenced was Mr. Decker's ADHD, the Court determines that Mr.
Decker is not contending that bipolar disorder is a perceived impairment here.

an inability to comprehend:  "[H]e goes I know you have this – I can't think of the word he used, something around your disease, ailment he said, around your ailment, but you need to understand . . . ."  Decker Dep. at 95:24-96:2.  In contrast to the other of Alliant's managers who were aware that Mr. Decker had ADHD, the record contains no evidence that Mr. Flitcroft was aware that Mr. Decker's ADHD was regulated by medication and that the symptoms associated with his condition did not exist.  Thus, a reasonable trier of fact could understand that Mr. Flitcroft's statements show that Mr. Flitcroft perceived Mr. Decker to have a substantially limiting impairment that impeded capacity for learning and working.[14]  Mr. Decker has presented at least a minimum of evidence from the record to show that Alliant may have regarded him as disabled.

As a result of the conflicting accounts of Messrs Decker and Flitcroft, there is a triable issue of fact as to whether Mr. Flitcroft regarded Mr. Decker's ADHD as substantially limiting him major life activities.

## 2.  *Prima Facie* Element:  Suffered an Otherwise Adverse Employment Decision as a Result of Discrimination

Contrary to Alliant's contention otherwise, the Court determines that in the event that a trier of fact concludes that Mr. Decker was regarded as having a disability, the trier of fact could also find that Mr. Decker has presented sufficient evidence to establish the existence of the third prong of the *prima facie* case, to wit, that he suffered an adverse employment action as a result of discrimination.  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 579-80 (3d Cir. 1998).  That is, he

---

[14]  Mr. Decker argues that Mr. Decker could be perceived as limited in the major life activities of learning and working.  *See* Pl.'s Resp. at 24.  Insofar that Mr. Decker argues that he is perceived as limited in the major life activity of thinking and cognition, *see* Pl.'s Resp. at 4-5, 12-13 (discussing thinking and cognition as a major life activity and equating learning and cognition), the Court determines that there is a material issue of fact as to whether Mr. Flitcroft perceived Mr. Decker to have such limitations.

must show that his perceived disability was a "determinative factor" in Alliant's decision to terminate his employment.  *See Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 214-15 (3d Cir. 2000) (holding that "determinative factor" is the appropriate term when applying the burden-shifting framework in pretext cases); *see also* Model Third Circuit Civ. Jury Instruction 9.1.2 (2008) (instructing that a plaintiff "must prove that [his/her] [disability] was a determinative factor in [defendant's] decision"); Model Third Circuit Civ. Jury Instruction 9.1.2 (2011) (same).

To be sure, the "'burden of establishing a prima facie case of disparate treatment is not onerous.'"  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Burdine*, 450 U.S. at 253).  After all, the *prima facie* case under the *McDonnell Douglas* framework serves to "'raise[] an inference of discrimination'" on the grounds that "'we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"  *Burdine*, 450 U.S. at 254 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  And as stated, *supra*, the goal of the *prima facie* case "is to eliminate the most obvious, lawful reasons for the defendant's action," such as, by way of example, that "no adverse action such as failure to hire or firing was actually taken."  *Pivirotto*, 191 F.3d at 352. Indeed, no such obvious reason is present here with respect to the third prong of the *prima facie* case.

An adverse employment action is one which alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.  *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997), *overruled in part on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006) *and by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998).  Mr. Decker's termination of employment qualifies as an adverse employment action.

18

Furthermore, in viewing the evidence presented in the light most favorable to Mr. Decker as the non-movant, the Court concludes that Mr. Decker presents sufficient circumstantial evidence from which a fact finder could reasonably conclude that the adverse employment decision is a result of discrimination.  This is not, as Alliant contends, a scenario where a plaintiff only can show an employer's mere awareness of a disability absent any other appropriate evidence to connect the disability to the adverse employment decision.  Rather, there is an adequate evidentiary basis to infer that Mr. Decker's perceived disability was a determinative factor in Alliant's decision to terminate him.  Namely, there is record evidence, when viewed in a light favorable to Mr. Decker, that shows that, *inter alia*, Alliant retracted its initial decision to terminate Mr. Decker, Alliant then terminated Mr. Decker shortly following Mr. Flitcroft's "ailment" conversation with Mr. Decker, Mr. Flitcroft was involved in the decision to terminate Mr. Decker (and, as Alliant's President and CEO, was the senior-most individual who held the view that Mr. Decker should be discharged even when there was disagreement among the managers about ending Mr. Decker's employment before the PIP's conclusion), and that Alliant failed to allow Mr. Decker to complete the PIP in favor of discharging him prior to its end-date.

A trier of fact could reasonably infer, particularly from the close temporal proximity of many of these events to Mr. Decker's termination date and all of which preceded the PIP completion date, that Mr. Decker's alleged perceived disability was a determinative factor in Alliant's decision to terminate him.  Thus, although the record certainly contains credible evidence that could support a contrary inference, Mr. Decker has presented sufficient evidence to preclude summary judgment as to the third prong of the *prima facie* case.

3.  Pretext

Alliant argues that even if Mr. Decker has met the requirements of the *prima facie* case for purposes of this motion, he cannot satisfy his burden of establishing pretext.  According to Alliant, Mr. Decker cannot show that its proffered legitimate non-discriminatory reasons for terminating Mr. Decker—his "ongoing poor performance and failure to succeed on the February 2006 Performance Plan"—are pretextual.  The Court disagrees.  The record raises an issue of fact as to whether Mr. Decker's termination was for a legitimate, nondiscriminatory reason or whether it was pretext for discrimination in violation of the ADA.

A plaintiff can show pretext, and so defeat a motion for summary judgment, "by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  Mr. Decker proceeds as to the first means of showing pretext.

Under this approach, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  *Id.* (citation omitted).  This can be accomplished by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (citation omitted).  "[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the

20

plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.* at 764.

Mr. Decker points to several aspects of the record that cast doubt on Alliant's articulated reasons for terminating Mr. Decker.  Specifically, he highlights evidence in the record that undermines Alliant's contention that his ongoing performance was poor and that he was failing to meet the PIP objectives.  Indeed, Mr. Decker sets forth specific facts to show that he was meeting the criteria set forth in the PIP, which refutes Alliant's articulated reasons.

Under the PIP, Mr. Decker was required "to maintain a minimum of 4 proposals per week" and "to book a minimum of five appointments per week two of which [required his presence]."  Def.'s Mot., Ex. E.  In addition, according to the terms of the PIP, if Mr. Decker was not meeting the minimums for proposals and appointments *and* did not "have a pipeline to substantiate gross profit dollar totals which [would] lead to an average of \$30,000/month for the next quarter," Alliant reserved the right to terminate or modify his employment.  *Id.*

Mr. Decker testified that during the PIP he made a minimum of four proposals per week and held at least five meetings per week.  *See* Decker Dep. at 48:1-48:48:4, 74:20-75:2.  Mr. Decker also contends that before April 1, the PIP completion date, he had completed sales "that not only covered [the] year-to-date, but enough to carry him through the [next quarter]."  *Id.* at 49:9-49:11.  Indeed, Mr. Decker testified that by the time he was terminated he had either made enough sales or had enough potential sales in his pipeline to have achieved "a hundred and sixty percent" of the PIP-required \$30,000/month for the second quarter of the year.  *Id.* at 50:17-52:22.  According to Mr. Decker, during his weekly meetings with Mr. Montone, he and Mr.

Montone would review his work under the plan and that Mr. Montone told him that he was performing well under the PIP and to keep "doing what [he] was doing." *Id.* at 53:23-53:25.

In addition, when this evidence is viewed in light of other aspects of the record previously discussed in relation to prong three of the *prima facie* case, such as Alliant's inconsistent positions about allowing him to complete the PIP—recanting the initial decision to terminate him and then terminating him before the April 1, 2006 completion date—and the temporal proximity of Mr. Flitcroft's "ailment" conversation to Mr. Decker's termination, a trier of fact could disbelieve and find incoherencies and inconsistencies in Alliant's articulated reasons for terminating Mr. Decker.

While the record also contains evidence that Mr. Decker might have been unsuccessful in meeting his PIP objectives,[15] the Court, in viewing the record in favor of Mr. Decker, concludes that there is enough evidence that creates a genuine issue regarding whether Mr. Decker was terminated for legitimate reasons or whether those reasons are pretext for discrimination based upon his perceived disability.

Accordingly, the Court denies Alliant's motion as to the ADA and PHRA disparate treatment claims.

**B. Failure to Accommodate Claim**

---

[15]  For example, Mr. Flitcroft testified that in a March 30, 2012 meeting Mr. Decker "actually admitted to me that he had missed his plan.  He had missed it dramatically actually, and that he believed that he could meet it in the next quarter."  Flitcroft Dep. at 15:19-15:22.

There is also evidence that Mr. Decker was not meeting the PIP at various points in time throughout its term. Mr. Flitcroft testified that—before March 14, 2006 when Mr. Brennan first informed Mr. Decker that he was going to be terminated—Mr. Montone informed him that he did not believe that Mr. Decker would "make his plan" and that this occurred.  *Id.* at 20:21-20:23.  Mr. Flitcroft also testified that 30 days into the PIP Mr. Decker's projected gross profit production was $16,000 and this was "so far off" Mr. Decker's quota of $90,000 in gross profit for the first quarter of the year.  *Id.* at 21:12-21:17.

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor*, 184 F.3d at 306.  For an employer "to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'"  *Hohider*, 574 F.3d at 186-87 (quoting *Williams*, 380 F.3d at 761) (internal quotations omitted).[16]

In addition to sustaining the burden of establishing these elements, the Court of Appeals for the Third Circuit recognized in *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, that "'[o]n the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits'" and that "[s]ummary judgment may be granted for a defendant only 'in cases in which the plaintiff's proposal is either clearly *ineffective or outlandishly costly*.'"  *Id.* at 284 (quoting *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir.1999)); *see generally Gaul*, 134 F.3d at 580-81 (recognizing that a plaintiff must "demonstrate as part of his facial showing that the costs associated with his proposed accommodation 'are not clearly disproportionate to the benefits that

_____

[16]   The term, "reasonable accommodation," includes:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001) (quoting 42 U.S.C. § 12111(9)(B)).

it will produce'" as part of determining the reasonableness of a particular accommodation

(citation omitted)). Thus "[i]f the plaintiff satisfies his or her burden, the defendant then has the

burden to demonstrate that the proposed accommodation creates an 'undue hardship' for it."

*Skerski*, 257 F.3d at 284. Liability for failure to provide reasonable accommodation will not

attach, if the proposed accommodations would impose an undue hardship on the operation of the

business of the employer. *See Williams*, 380 F.3d at 761 (citing *Taylor*, 184 F.3d at 306).[17]

Alliant argues that Mr. Decker's reasonable accommodation claim warrants summary

judgment because (1) Mr. Decker cannot prove he is disabled within the meaning of the ADA,

and (2) Mr. Decker's request for 30-day leave was not on account of a disability.[18] The Court

concludes that neither of these reasons provide grounds for granting summary judgment. First,

as previously discussed, *supra*, in relation to the disparate treatment claim, there is a material

issue of fact as to whether Mr. Decker qualifies as having a "regarded as" disability in light of

Mr. Flitcroft's comments concerning Mr. Decker's "ailment."

Second, in insisting that a plaintiff must show as part of the *prima facie* case that an

"accommodation must be *for a disability*," Alliant appears to derive greater meaning from case

---

[17] Another way for an employee to demonstrate that his or her employer breached its duty to provide reasonable accommodations is to show that the employer failed to engage in good faith in an interactive process. *See Taylor*, 184 F.3d at 312. However, failure to engage in an interactive process is not dispositive. *See, e.g.*, *Hohider*, 574 F.3d at 193 ("[F]ailure to engage in the interactive process, in itself, does not constitute . . . a violation [of the ADA]."). Furthermore, there is no indication in Mr. Decker's Complaint, nor in his arguments opposing summary judgment, that he is advancing his failure to accommodate claim on the grounds of failing to engage in an interactive process.

[18] In responding to the Alliant's argument, Mr. Decker's arguments make reference to a conversation between Mr. Montone and Mr. Decker in which Mr. Decker contends that he asked for "leeway." The Court does not consider this to be the requested accommodation at issue both because these facts are not the basis for Alliant's Motion and because Mr. Decker's Complaint does not advance a failure to accommodate claim that arises from such a fact pattern. Indeed, the Complaint does not contain any factual allegation that Mr. Decker made a request for "leeway" to Mr. Montone, or made such a request generally.

law language than is warranted.  As Alliant highlights, there are cases that frame a reasonable

accommodation in the context of a plaintiff's disability.  *See, e.g.*, *Hohider*, 574 F.3d at 187

(articulating that one element of the *prima facie* case is that an adverse employment decision as a

result of discrimination can include an employer "refusing to make reasonable accommodations

*for a plaintiff's disabilities*" (emphasis added)).

 However, it appears Alliant reads such case law too narrowly—reading it to refer only to

an actual existing impairment—by arguing that Mr. Decker's 30-day leave request cannot be

deemed a reasonable accommodation because Mr. Decker has admitted that he requested the

leave for reasons unrelated to his medical conditions.  This reading entirely omits consideration

of a "regarded as" disability, which is the disability at issue here.

 The Court recognizes that insofar that cases have referenced a reasonable accommodation

in the context of a "disability," it appears to be shorthand for describing an individual's physical

or mental limitations.  Indeed, the ADA's precise language illuminates this matter; it specifies

that "an employer discriminates against a qualified individual with a disability when the

employer does 'not mak[e] reasonable accommodations *to the known physical or mental

limitations of the individual* . . . .'" *Taylor*, 184 F.3d at 306 (emphasis added) (quoting 42 U.S.C.

§ 12112(b)(5)(A)).

 Furthermore, this standard embraces those limitations that an employer *perceives* an

employee to possess.  After all, a reasonable accommodation claim may be brought as to a

"regarded as" disability.  The Court of Appeals for the Third Circuit has held that "the conclusion

seems inescapable that 'regarded as' employees under the ADA are entitled to reasonable

accommodation in the same way as are those who are actually disabled." *Williams*, 380 F.3d at

775.

It follows that Alliant's argument that "Plaintiff's request for leave was not 'for a disability' as required by law" fails. Here, evidence that Mr. Decker sought the 30-day leave to work out the issues relating to his employment, rather than due to his medical conditions, has no bearing on the issue of whether Alliant refused a reasonable accommodation to Mr. Decker's *perceived* limitations, and more specifically, whether Mr. Decker has made the appropriate evidentiary showing to meet his burden of identifying such an accommodation and demonstrating that the costs of which, facially, do not clearly exceed its benefits.[19] Given that Alliant is effectively arguing that Mr. Decker does not meet a standard that is not required to

---

[19] Furthermore, the Court notes that the record is rather ambiguous as to how the 30-day request for leave was raised to Alliant, which raises a material issue of fact appropriate for a fact finder's resolution. Only several witness depositions shed light on how Mr. Decker proposed his 30-day leave request, and particularly Mr. Decker's deposition testimony is the most elucidating on the subject. At various points of Mr. Decker's testimony he states that in an e-mail to Mr. Flitcroft (an email that is not included in the record): "I requested [the leave] so we have time work things out," Decker Dep. at 99:1-99:2, "I requested [the leave] so we can work something out," *id.* at 99:5-99:6, and "I just said I wanted thirty days leave and I expressed this to him specifically so we can work through things," *id.* at 106:14-106:16. This testimony can be understood in several ways.

One interpretation would allow for the inference that he requested 30-day leave with the explicit explanation that it would allow time to "work things out" with respect to his employment status. Another interpretation would allow for the understanding that Mr. Decker wrote the term, "work things out," which is ambiguous and could have been read by the employer as some sort of reference to Mr. Decker's *perceived* limitations. Yet another understanding of Mr. Decker's testimony allows for the interpretation that Mr. Decker simply requested 30-day leave without any explanation or clarification, and only with the subjective (and unspoken) purpose of seeking a quiescent period to allow for his employment status to be settled. That the record reflects that Alliant managers were discussing with Mr. Decker other possible alternatives to ending Mr. Decker's employment around this time period does not necessarily illuminate any particular interpretation one way or another.

Given that the summary judgment standard requires considering the evidence in the light most favorable to Mr. Decker, the Court infers based upon the evidence that Mr. Decker made the 30-day request without any additional, explicit explanation for his purpose for doing so, and that, given the entirety of the record, in this way a reasonable fact finder might discern the request was a request for accommodation due to his "regarded as" disability.

26

establish the *prima facie* case, this argument does not provide appropriate grounds for granting summary judgment.

Accordingly, the Court denies Alliant's motion as to the ADA and PHRA failure to accommodate claims.

## IV.  Conclusion

For the forgoing reasons, the Court denies Alliant's Motion for Summary Judgment as to all claims.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge